THOMAS F. WHITESIDE, JR. v. THE STATE.

No. 11991.   Delivered December 12, 1928.

The opinion states the case.

*Sanders & McLeroy* of Center and *Jno. M. Cobb* of Houston for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

MARTIN, JUDGE.—Offense, murder; penalty, eighteen years in the penitentiary.

The facts present an unusual case. Appellant was an attorney in the City of Houston and was the husband of deceased. Together they occupied an upstairs apartment. The substance of the State's evidence is that appellant with three companions on the night of the tragedy came to appellant's apartment drunk; that appellant wanted them to leave and deceased asked them not to, stating at the time that she feared appellant would kill her. They finally did leave, after which time appellant so terrorized and frightened deceased that she jumped from an upstairs window to the ground below in order to escape him, breaking her spine, from which injury she died about three weeks later. Appellant's evidence in substance showed that all the parties, including deceased, had been drinking and that deceased was hysterical and that while overcome by hysteria she jumped of her own volition from the window with the results aforesaid. There was also introduced by the state prior alleged assaults and mistreatment of deceased by appellant, not necessary to here detail further than they may appear in the discussion of various bills

of exception taken to their admissibility. The indictment after charging that appellant made an assault upon and threatened to kill deceased proceeds as follows:

"Did by threatening, words and gestures so terrorize and frighten the said Rosa Whiteside that she believing her life to be in danger, did jump to the ground from a window in said room, thereby injuring herself, from which injury the said Rosa Whiteside died, to-wit, on the 8th day of August, A. D. 1927, which said words, threats, gestures and assault was then and there reasonably calculated to produce and did then and there produce the aforesaid act of Rosa Whiteside in jumping from said window, and which said act of the said Rosa Whiteside was then and there the immediate cause of her death, and so the grand jurors aforesaid do present that Thomas F. Whiteside, Jr., did then and there in the manner and by the means aforesaid, of his malice aforethought kill the said Rosa Whiteside."

It is claimed that this indictment was duplicitous. We think the effect of the language when fairly construed was to allege jointly the use of the several means therein stated to produce the effect charged. Under these circumstances it is well settled that several means of killing may be alleged in the same count. Medina v. State, 49 S. W. 380; Gonzales v. State, 5 Tex. Crim. App. 584; Burt v. State, 38 Tex. Crim. Rep. 440.

Various bills of exception were reserved to parts of a purported dying declaration of deceased. Among the statements of deceased admitted over objection was the following:

"She (deceased) said she hadn't seen her husband that day, that is, the day she got hurt; that he had gotten a passport to go to Mexico and sold his furniture."

Upon objection to this, State's Attorney made the statement that it was material and that it showed preparation in advance for flight prior to the injury. This did not pertain to the circumstances of the death of deceased. It was the statement of a fact disconnected from it and referred in no way to the immediate cause of it and was in no way a part of the circumstances immediately connected with it. The reason given by the State's Attorney for its admissibility furnished a proper one for its exclusion, under the authorities. The rule has been stated by Mr. Underhill as follows:

"The declaration is admissible only so far as it points directly to the facts constituting the res gestae of the homicide; that is to say, to the act of killing and to the circumstances immediately attendant thereon. A dying statement showing why the deceased went to the

place where the homicide was committed, or that, after the crime, he stated to a bystander that he was unarmed, or stating actions of the accused or of the deceased prior to the circumstances directly involved in the homicide as the possible motive for it, is not admissible." Underhill's Criminal Evidence (3rd Edition) Paragraph 178. See also Ex parte Barber, 16 Tex. Crim. App. 369; West v. State, 7 Tex. Crim. App. 157; Simmons v. State, 3 S. W. (2nd) 450. For full collation of authorities, see Vernon's C. C. P. (1925), Art. 725, Note 6.

Another of these statements is exhibited in Bill of Exception No. 11, and is as follows: "Mary, he was going to kill me, I know; that he had struck her in the head with an ice pick before and she knew he was going to kill her with the ice pick," which was not in answer to a question of the District Attorney. "Was that at this time he had struck her with the ice pick," to which the witness, Mrs. Davis, answered, "No, it was not at this time, he had struck her a week before."

It was said in the case of Ex parte Barber, supra:

"The statement by the deceased of a distinct fact not connected with the circumstances of the death, or the immediate cause of it, is not admissible as a dying declaration, though competent and legal evidence if established by any other competent witness."

The fact that he had struck her with an ice pick before was of course admissible if testified to by a competent witness, but under the authorities could not be proved by a dying declaration. We do not think that any part of this statement was admissible. The remainder is a conclusion and opinion of the witness, which could not have been testified to if deceased had been living.

A multitude of bills of exception to the admissibility of parts of the State's evidence appear in the record, most of them insufficiently drawn to present any question for review. A number of them complain of the admission of evidence but fail to show what, if any, evidence was admitted. Nearly all of them fail to set out facts showing the irrelevancy and inadmissibility of the testimony complained of. We cannot supply by presumptions such essential facts. The burden is on appellant to show error by a proper bill of exception. We have monotonously repeated over and over the rules for the guidance of the profession in the preparation of bills of exception. These will be found collated under Art. 667, C. C. P. (1925), and occupy several closely printed pages. No useful purpose can be served in taking space to review a question so plainly and ofttimes decided. In view, however, of another trial, we deem it best to

discuss generally a few of the questions shown in appellant's bills, some of which are properly presented.

It is permissible to prove antecedent menaces, prior assaults, former grudges and quarrels between the accused and deceased to show malice and to establish the motive of the accused. McKinney v. State, 8 Tex. Crim. App. 626; Hall v. State, 31 Tex. Crim. Rep. 565; Medina v. State, 49 S. W. 380; Branch's P. C., Sec. 1881. However, testimony of extraneous and disconnected matters which could only prejudice the jury against defendant is not admissible when the homicide is not shown to have grown out of such matters. Phillips v. State, 22 Tex. Crim. App. 139; Price v. State, 65 S. W. 909; Branch's P. C., Sec. 1882. Within this class was testimony in this case by Mrs. Burkey to the effect that appellant had kicked his child down after he had whipped it and by the witness Martin that defendant had had trouble with his brother and his brother reported that defendant had whipped his wife. Questions were also asked with reference to a certain woman sitting in the lap of appellant and of her attending a call of nature in a garage in appellant's presence. These matters were particularly prejudicial and clearly inadmissible. The State should not attempt to go into them on another trial.

Bill No. 22 shows that witness Hill for the State testified over objection that "he heard a woman scream at five o'clock in the morning not more than ten days previous to the date of the alleged offense, and heard a woman begging to stop and not to do that, and heard a man say, "Shut up, I will cut your damn throat." The objections to this were that the actors in this occurrence were not identified. The bill is qualified to show that witness Hill testified that this came from the place where deceased jumped to her death. In passing we desire to say that the statement of facts shows the witness testified, "I didn't know who it was, this voice I heard * * * and I really don't know whose it was. * * * That noise was around in that direction but I don't know who it was." It seems hardly necessary to add that such testimony is inadmissible unless it is shown either circumstantially or directly that appellant was present and connected with it.

Amongst statements objected to as shown in Bill No. 19 is one by witness Mrs. Machen that "every night from the 5th of June until the night deceased leaped from the window * * * that defendant was torturing her in some way; could not see what defendant was doing to deceased." If the witness couldn't see what was being done, and the record plainly shows this to be a fact, she should

not have been permitted to testify to her conclusion that "defendant was torturing her." The Court qualifies this bill to show it was admitted to show animus. Animus of course is provable as previously explained, but this does not justify the expression of a highly inflammatory opinion and conclusion. Nor was the statement of the witness Mrs. Wesley Crump "he choked her then I guess" admissible for any purpose, it appearing that witness did not see the occurrence. These witnesses and all others should be permitted to state what they heard and saw tending to show animus or ill will, but ought not to be permitted to make inflammatory statements of a purely conjectural character.

It is vigorously argued that this prosecution was under Art. 1206, P. C., and that said article being invalid the prosecution must fail. If we comprehend the theory of appellant, it is that Art. 1206, P. C., defines an offense and that same is vague and indefinite and uncertain, that the facts of the instant case are not within its terms, and that no penalty is provided for its violation. A sufficient answer to this is that the prosecution was not under said article. This was a prosecution for murder, as that term is defined under another article of the Penal Code. It was never intended by Art. 1206 to define and provide for the punishment of an offense. This article is set into Chapter 11, P. C. (1925), relating to homicide, which is defined by Art. 1201 as follows:

" 'Homicide' is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another."

Art. 1202 reads in part as follows:

"The destruction of life must be complete by such act, agency, procurement or omission. * * *"

Art. 1206 is as follows:

"Although it is necessary to constitute homicide that it shall result from some act of the party accused, yet if words be used which are reasonably calculated to produce and do produce an act which is the immediate cause of death, it is homicide; as for example, if a blind man, a stranger, a child, or a person of unsound mind, be directed by words to a precipice or other dangerous place where he falls and is killed; or if one be directed to take any article of medicine, food or drink, known to be poisonous and which does produce a fatal effect; in these and like cases the person so operating upon the mind or conduct of the person injured shall be deemed guilty of homicide."

It seems plain that Art. 1206 was intended merely to explain and amplify the means by which an unlawful homicide might be committed and must be read in connection with the articles preceding it, all relating to the general subject of homicide. It is but a substantial redeclaration of the common law upon the same subject. It is explanatory especially of the word "act" as used in the articles preceding it, so that its meaning might not be too restricted. It was intended to insure such an interpretation of the law of homicide as would include words as well as acts among the means by which an unlawful homicide could be committed. In this connection, however, we notice that the verdict of the jury reads as follows:

"We, the jury in the foregoing case, do find the defendant, Thomas F. Whiteside, Jr., guilty of homicide and assess the penalty at 18 years in the penitentiary."

There is no such offense as homicide. It is a generic term made to apply to acts which are not offenses, as well as to those which have been defined and denounced as penal offenses by the statute. Under the law as it existed when this offense was committed, homicide was divided into murder, manslaughter and negligent homicide, as well also as justifiable and excusable homicide. These various species of homicide are fully defined and dealt with in separate chapters of the Penal Code of 1925, beginning with Chapter 11 and ending with Chapter 16. This case seems to have been tried upon the theory that homicide is an offense, as the Court in his charge authorized a conviction of homicide. The defendant was on trial for murder, limited and explained as it is by the articles of the various chapters of the Penal Code already referred to and committed in the manner charged in the indictment. In our opinion the verdict finding him guilty of homicide, which is not an offense defined or punishable under our law, was not responsive to the allegations of the indictment and was meaningless. Wyvias v. State, 64 Tex. Crim. Rep. 236; Buster v. State, 42 Tex. 315; Guest v. State, 24 Tex. Crim. App. 530. The Court should not authorize on another trial a conviction for an unknown offense.

Alleged errors not discussed are such as are not likely to occur on another trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.